**2009 BNH 024**      Note:  This is an unreported opinion.  Refer to LBR 1050-1 regarding citation.

_____

# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF NEW HAMPSHIRE

In re:                                                          Bk. No. 08-12158-JMD
                                                                Chapter 7
Nancy E. Tucker,
              Debtor


Nancy E. Tucker,
              Plaintiff

v.                                                              Adv. No. 08-1159-JMD

Sallie Mae, Inc. and
New Hampshire Higher Education Assistance Foundation,
              Defendants

*Darlene M. Daniele, Esq.*
*Salem, New Hampshire*
*Attorney for Debtor/Plaintiff*

*Grenville Clark, III, Esq.*
*Gray, Wendell & Clark, P.C.*
*Manchester, New Hampshire*
*Attorney for Defendant Sallie Mae, Inc.*

*Mark F. Weaver, Esq.*
*Ford & Weaver, P.A.*
*Portsmouth, New Hampshire*
*Attorney for Defendant New Hampshire Higher Education Assistance Foundation*

# MEMORANDUM OPINION

## I.  INTRODUCTION

Nancy Tucker (the "Debtor") filed this adversary proceeding seeking to except her

student loan obligations to Sallie Mae, Inc. ("Sallie Mae") and New Hampshire Higher

Education Assistance Foundation ("NHHEAF") from discharge under 11 U.S.C. § 523(a)(8). The Court conducted a trial on July 21, 2009, and took the matter under advisement. This Court has jurisdiction of the subject matter and the parties pursuant to 28 U.S.C. §§ 1334 and 157(a) and the "Standing Order of Referral of Title 11 Proceedings to the United States Bankruptcy Court for the District of New Hampshire," dated January 18, 1994 (DiClerico, C.J.). This is a core proceeding in accordance with 28 U.S.C. § 157(b).

## II.  FACTS

### A.  The Debtor's personal background

The Debtor is an unmarried, forty-year-old woman with no children and no other dependents. She currently lives by herself in a modest apartment, is unemployed, and lives off of social security disability benefits. She testified at trial that she has suffered from depression and anxiety since she was twelve years old. She also testified that she attempted suicide when she was about fourteen and again on two other occasions several years later. After her first suicide attempt, she was hospitalized for three months, and she has been in and out of treatment ever since. Because of her long history of depression and anxiety, the Debtor maintains that she cannot be gainfully employed and earn enough income to make the payments required on her students loans with Sallie Mae and NHHEAF.

### B.  The Debtor's income and employment history

The Debtor did not graduate high school but received her GED in 1987. That same year she also attended a cosmetology school but did not finish. After that, from 1987 to about 1993, the Debtor worked a series of bookkeeping jobs, most of which were short-lived because, she

testified, her depression or anxiety prevented her from effectively focusing and concentrating. She also frequently cried and had anxiety attacks, slept for excessively-long periods, and had trouble getting out of bed.  From 1994 to about 2002, the Debtor was largely unemployed, except for two brief jobs, one as a bookkeeper with an irrigation company owned by the Debtor's sister and brother-in-law, and another working for a company in Maine while she lived there for a few months with her father.  Concurrently with this same period, from about 1993 to 2002, the Debtor applied for and received social security disability benefits because of her condition.  She also began treatment for her depression, which included counseling and medication.

In 2002, the Debtor began attending the College for Lifelong Learning, later renamed Granite State College ("Granite State").  While attending school, the Debtor worked part-time as a customer service representative for Granite State.  In September 2003, she was promoted to Senior Business Services Assistant and continued working while attending school.  Although not particularly clear from the record, at some point after this promotion the Debtor began working full-time while still attending school.  In June 2004, the Debtor received her associate's degree from Granite State.  She continued taking classes at the school, however, working towards her bachelor's degree in management.  In July 2005, the Debtor was promoted to Assistant Director of Financial Aid at Granite State, earning about $37,500 a year.  In July 2006, the Debtor received her bachelor's degree, and she continued working in her same position.  A few months later, in September 2006, the Debtor was promoted to Associate Director of Financial Aid at Granite State.  Although her annual salary at this new position was about $42,500, the Debtor never earned that much before taking a leave of absence and eventually leaving her job.

The Debtor testified that while in school she continued taking antidepressants for her condition. She felt much better about her condition while in school from 2002 to 2006, and, after she graduated, she felt she had beaten her struggle with depression. But at her new position as Associate Director, with the increased responsibility and stress, she struggled again with her symptoms. She began having difficulty going to work and would collapse on the weekends. As a result, her supervisor officially reprimanded her for taking too many sick days or being absent from work and frequently showing up late. One day, in February 2007, the Debtor apparently reached a breaking point. So she took a three-month leave of absence under the Family Medical Leave Act to deal with her symptoms, but she was unable to gain any control. In June 2007, she resigned from her job. The Debtor started seeing a therapist again and continued with her medication. From June 2007 to February 2008, the Debtor tried to continue working in some capacity. She used her contacts in the financial aid office at Granite State to work part-time as a self-employed consultant on financial aid issues. The Debtor also worked briefly as a part-time bookkeeper at a company owned by the family of a friend, Cindy Giuffre. But even these reduced and flexible work schedules were too much for her.

In February 2008, the Debtor refiled for social security disability benefits and began receiving payments of about $1,727 a month. She also received a $14,000 lump sum social security disability payment in early 2008 that represented her unpaid benefits for 2007. The Debtor remains unemployed. She filed for chapter 7 bankruptcy in July 2008 and later filed this adversary proceeding in December 2008.

The Debtor submitted her recent social security statement as an exhibit at trial.[1]  That exhibit provides a good overview of the Debtor's earning history and helps put the Debtor's episodes of depression in context with her work and income history.[2]  The exhibit shows the following:

| Years worked: | Taxed Social Security earnings: | Years worked: | Taxed Social Security earnings: |
|---|---|---|---|
| 1984 | $387 | 1997 | $8,200 |
| 1985 | $205 | 1998 | $0 |
| 1986 | $93 | 1999 | $1,000 |
| 1987 | $6,639 | 2000 | $0 |
| 1988 | $14,320 | 2001 | $0 |
| 1989 | $17,557 | 2002 | $2,454 |
| 1990 | $96 | 2003 | $5,816 |
| 1991 | $3,977 | 2004 | $30,028 |
| 1992 | $0 | 2005 | $35,295 |
| 1993 | $0 | 2006 | $37,660 |
| 1994 | $0 | 2007 | $14,387 |
| 1995 | $0 | 2008 | $1,317 |
| 1996 | $0 | 2009 | $0 (to date) |

### C.  Loan and repayment history

To finance her education at Granite State, the Debtor took out several student loans with Sallie Mae, NHHEAF, and Wells Fargo.  After graduation, she consolidated those loans in two loans with Sallie Mae and NHHEAF to get a better interest rate and to make payments more

---

[1]  See Debtor's Ex. 2 at 14.

[2]  The Court only relies on Exhibit 2 for context, not as an accurate statement of the Debtor's income.

5

convenient by reducing the total number of loans.  Those are the loans at issue in this case.  The details are as follows:

| Lender | Date | Amount loaned | Amount due | Monthly payments | Term | Interest rate |
|--------|------|---------------|------------|------------------|------|---------------|
| Sallie Mae | 11/6/06 | $31,803.67 | $34,156.08 | $273.66 | 232 mos. | 5.25% |
| NHHEAF | 6/6/06 | $22,915.53 | $24,000.45 | $131.64 | 292 mos. | 4.75% |

The Debtor maintains that she had an intent to repay the loans when she applied for them. She made interest payments on the loans while they were in deferment before she opted to consolidate.  After consolidating, the Debtor made eight payments on the Sallie Mae loan and eight payments on the NHHEAF loan.  She paid both using auto-debits from her bank account. Before she stopped making payments to Sallie Mae and NHHEAF, she applied for and received deferments or forbearances for some time.  But when she filed for bankruptcy, the loans went into default.

Based upon the Court's pretrial order, Sallie Mae offered to restructure the Debtor's loan by proposing that the Debtor make monthly payments of $101.18 for 240 months at 2% interest on a reduced principal balance of $20,000.[3]  NHHEAF did not offer to restructure the Debtor's loan because it believes that payment on the note will not impose an undue hardship on the Debtor.  Therefore, NHHEAF insists that the Debtor pay according to the original terms: monthly payments of $131.64 at 4.75% interest for 292 months on an outstanding balance of $24,000.45.[4]

---

[3] See Doc. No. 35.

[4] See Doc. No. 37.

### D.  The Debtor's medical problems

Because this case largely centers around the Debtor's medical condition and how it impacts her long-term ability to maintain steady employment and repay her student loans, the Court will offer more detail on this issue.

#### 1.  The other medical condition evidence

The Court already discussed the Debtor's testimony on her depression, but other evidence in the record also offers more on this point.  Sallie Mae submitted the Debtor's responses to interrogatories as a trial exhibit in which the Debtor describes her condition's history and its symptoms:

> I have a long history of suffering from severe depression.  My depressive episodes began around the age of 12 and have continued throughout my life.  I have had several suicide attempts with the first one being at the age of 14.  I was hospitalized for 3 months between the ages of 14 and 15.  I have remained in an [sic] out of treatment for nearly 30 years.
>
> This chronic depression has manifested itself with my inability to focus or concentrate.  I have difficulty with my memory.  I have difficulty staying awake and sleep for 16 - 18 hours per day at times.  I have suicidal thoughts on a regular basis and go for days without being able to get out of bed.  I overeat when I am depressed and have gained well over 100 pounds in the past 2 years.  Along with the depression I suffer from anxiety and rarely leave my house unless necessary.  Even with the support of family and friends I continue [to] struggle daily and I do not see relief.[5]

The Debtor goes on to explain that her depression caused her to miss an excessive amount of school when she was young and she eventually dropped out of high school as a result.  The Debtor's description of her symptoms in this exhibit is consistent with her testimony at trial.

---

[5]  See Sallie Mae's Ex. 104.

7

### 2.  Cindy Giuffre's testimony

The Debtor only called one witness other than herself, Cindy Giuffre, a friend.  Giuffre testified in support of the Debtor's contention that her depression and anxiety prevents her from maintaining a steady, decent-paying job to pay back her student loans.  In large part, Giuffre's testimony corroborated this contention.[6]

Giuffre has known the Debtor since about 1992 or 1993.  Giuffre first befriended the Debtor because Giuffre was initially friends with the Debtor's sister and, at the time, the Debtor was living at her sister's house.  Giuffre and the Debtor eventually became close friends and would visit each other or speak several times a week.  Giuffre and the Debtor frequently had heart-to-heart talks about issues and problems in their lives.  Giuffre testified that she knew early on that the Debtor had problems and was seeking treatment for depression, but she did not know the extent of the Debtor's mental health issues, at least at first.  Giuffre said that her children considered the Debtor as their aunt, even though she was not related to them.  The Debtor often visited Giuffre and her children and would babysit or take the children out for various activities.

Giuffre and the Debtor remained good friends even after the Debtor went back to school in 2002.  Giuffre believed that the Debtor worked hard towards her goal of graduating but that something changed after the Debtor graduated.  Upon graduating, Giuffre said the Debtor seemed very proud and in a much better mood because it seemed like the Debtor overcame her depression.  Not long after, however, Giuffre said the Debtor called and visited less frequently and seemed like she had less energy.  While the Debtor was on her three-month leave starting in February 2007, Giuffre saw the Debtor about three or four times.  She explained that her kids

---

[6]  Giuffre was sequestered outside of the courtroom while the Debtor testified.

would occasionally call the Debtor and plan an activity, but the Debtor often would not call back or follow through with the plans.  Giuffre became more concerned and would call, but the Debtor often did not answer the phone.  On a few occasions, Giuffre said she became so worried that she drove over to the Debtor's apartment to check on her.  When Giuffre did manage to see the Debtor, she said the Debtor seemed like she was in a deep depression.

Around this time, in October 2007, Giuffre offered the Debtor a part-time bookkeeping job at a small company owned by a member of Giuffre's family in the hopes that a job would improve the Debtor's mood and maybe draw her out of her depressive state.  The Debtor began working, and Giuffre told the Debtor to work at her own pace and come in when she wanted.  But, by February 2008, even that flexible schedule apparently became too much.  The Debtor was having too much trouble with her depression and anxiety.  Giuffre explained that it was mostly a mutual decision that the Debtor would not work for her family's company anymore.  Giuffre also stated that within the last six months or so, the Debtor still does not seem well because she has been secluded in her apartment and has effectively withdrawn from the world.

## III.  DISCUSSION

### A.  The Brunner standard

Under § 523(a)(8) of the Bankruptcy Code, a debtor cannot discharge educational loans unless excepting the loans from discharge "would impose an undue hardship on the debtor and the debtor's dependents."  In determining what constitutes undue hardship this Court has previously followed the three-part test set forth in Brunner v. New York State Higher Educ. Servs. Corp., 831 F.2d 395 (2d Cir. 1987).  See, e.g., McClain v. Am. Student Assistance (In re

9

McClain), 272 B.R. 42, 47 (Bankr. D.N.H. 2002); Grigas v. Sallie Mae Servicing Corp. (In re

Grigas), 252 B.R. 866, 874 (Bankr. D.N.H. 2000).  Under Brunner, student loan obligations

impose an undue hardship within the meaning of the statute, and can be discharged, if:

   A.   The debtor cannot maintain, based on current income and expenses, a minimal
        standard of living for himself and his dependents if forced to repay the loan;

   B.   Additional circumstances exist indicating that this state of affairs is likely to
        persist for a significant portion of the repayment period of the student loan; and

   C.   The debtor has made good faith efforts to repay the loan.

Brunner, 831 F.2d at 396; McClain, 272 B.R. at 47; Grigas, 252 B.R. at 874; Garrett v. New

Hampshire Higher Educ. Assistance Found. (In re Garrett), 180 B.R. 358, 362 (Bankr. D.N.H.

1995).

### B.  The burdens of proof and production

The creditor bears the initial burden of proving the existence of the debt and that the debt

is of the type excepted from discharge under § 523(a)(8).  Educ. Credit Mgmt. Corp. v. Savage

(In re Savage), 311 B.R. 835, 839 (B.A.P. 1st Cir. 2004).  Once the creditor satisfies that burden,

the burden shifts to the debtor to prove undue hardship by a preponderance of the evidence.  Id.;

see Grogan v. Garner, 498 U.S. 279 (1991).  After the debtor makes a showing that would

support an undue hardship determination, the burden of production—the duty of going forward

with evidence—shifts to the creditor to present some evidence to rebut the debtor's prima facie

case.  Votruba v. Florida Dep't of Educ. (In re Votruba), 310 B.R. 698, 704 (Bankr. N.D. Ohio

2004).

The parties do not dispute the existence of Sallie Mae or NHHEAF's loans or that their loans fall under § 523(a)(8).  Accordingly, the Debtor has the burden of proving all three Brunner factors to obtain a discharge of her student loans.  See Brunner, 831 F.2d at 396.

### C.  Analysis

#### 1.  Ability to maintain a minimal standard of living

Under Brunner, the Debtor must demonstrate that she cannot contain maintain, based on current income and expenses, a minimal standard of living for herself if forced to repay the loans.  Although the Debtor has the burden of proving this factor, Sallie Mae and NHHEAF conceded at trial that the Debtor cannot repay the loans based on her current income and expenses.  The record also supports such a finding.  Even considering the adjustments made to her schedules I and J at trial, the Debtor barely breaks even without factoring her student loan payments.  She lives in modest apartment, paying $835 in monthly rent.  She testified that her apartment is the least expensive in the area, and she purposely asked for an apartment on the bottom floor of the building because the rent is $20 cheaper per month.  Her utilities are minimal and she hardly ever buys clothes.  By most standards, the Debtor already lives a very frugal lifestyle.  Therefore, the Court finds that the Debtor met her burden on this factor.

#### 2.  Good faith efforts to repay

Under Brunner, the Court must also determine whether the Debtor made good faith efforts to repay her loans with Sallie Mae and NHHEAF.  The record is undisputed that, after graduating, the Debtor made eight consecutive payments on each of her loans.  And before she stopped making payments, she applied for and received deferments or forbearances on the loans.  NHHEAF argues that the Debtor has not made a good faith effort to repay because she has not

applied for a disability waiver program or an income contingent repayment program that would require payments on her loans to be based solely on her income (and which would provide her twenty-five years for repayment with the potential to forgive any unpaid loan balance after that time period).  Sallie Mae also argues that the Debtor did not make a good faith effort because she failed to take advantage of any of its payment accommodation programs or accept its pretrial restructuring offer.[7]

After refiling for social security disability in February 2008, the Debtor began receiving monthly benefit payments of about $1,727.  She also received a lump sum back payment of over $14,000 in early 2008 for benefits for which she was eligible in 2007 that were never paid to her.[8]  Both NHHEAF and Sallie Mae argued at trial that the Debtor's use of the $14,000 lump sum payment to pay other expenses demonstrates a lack of good faith effort to repay her student loans.  NHHEAF cross-examined the Debtor about her use of this money.  The Debtor explained that she used most of the money to repay her mother and friends who had loaned her money to help her pay bills and meet expenses.  She also used some of the money to make payments on prepetition debts.  She said she did not use the money to pay her student loans because the loans were in deferment at the time.  Sallie Mae briefly cross-examined the Debtor about a few $300 deposits into her checking account in February and March 2009.[9]  The Debtor explained that she occasionally receives some money from friends or relatives, but she does not like to ask for help with meeting her living expenses.  She says she often runs into a shortfall but that some of her

---

[7]  See Doc. No. 42, Joint Pretrial Statement.

[8]  See Debtor's Ex. 2 at 9.

[9]  See Sallie Mae's Ex. 107.

bills, like groceries, are flexible, and if she does not appear to have enough money to pay some expenses she will just spend less on things like food and gas.

Courts applying <u>Brunner</u> define good faith as "a substantial effort to realize opportunities from one's education and resources as well as minimize costs of living." <u>Great Lakes Higher Educ. Corp. v. Brown (In re Brown)</u>, 239 B.R. 204, 209 (S.D. Cal. 1999). The good faith inquiry generally considers whether a debtor made monthly payments or attempted to negotiate an alternative payment plan with the lender. <u>Neal v. New Hampshire Higher Educ. Assistance Found. (In re Neal)</u>, 354 B.R. 583, 590 (Bankr. D.N.H. 2006). Based on the record, the Court finds that the Debtor has demonstrated a good faith effort to repay her loans.

### a.  The loan payments

The Debtor made eight consecutive monthly payments on each of her loans with NHHEAF and Sallie Mae, after which she applied for and received forbearances and deferments. She paid what she could while she had a decent-paying job, and she did not hoard her discretionary income, make unnecessary purchases, or live beyond her means. She stopped making monthly payments shortly after she resigned from her full-time position at Granite State once she realized that she could not continue working because the symptoms of her depression were not going away and were preventing her from being a productive employee.

### b.  Alternative repayment plans

While a debtor's failure to take advantage of an alternative repayment plan can be a factor in the good faith determination for undue hardship, such failure, by itself, does not conclusively establish a debtor's lack of good faith. <u>Allen v. Am. Educ. Servs. (In re Allen)</u>, 324 B.R. 278, 281 (Bankr. W.D. Pa. 2005). The Court cannot find that the Debtor's failure to

successfully negotiate an alternative repayment plan with either Sallie Mae or NHHEAF precludes a good faith finding in this case.

The Debtor first sought a forbearance or deferment for both of her student loans after she realized she would not be able to make the monthly payments shortly after she left her job in June 2007 at Granite State because of her depression.  The deferments or forbearances continued until she filed for bankruptcy, and only then did the loans go into default.  This is not a case where the debtor let her student loans lapse and go into default without bothering to check up on them until she filed for bankruptcy and decided to get them discharged.  The Debtor here almost immediately recognized that she needed to apply for a deferment after she became unemployed.[10]

Likewise, the Court does not fault the Debtor for turning down the disability-based alternative repayment plan or waiver because the Debtor investigated the possibility and determined that her depression was considered a pre-existing condition that made her ineligible.[11]  The Debtor cannot be blamed for failing to take advantage of the impossible.  And the Court cannot find that the Debtor lacked good faith by not taking advantage of an income contingent repayment plan when Sallie Mae and NHHEAF both conceded at trial that the Debtor does not currently have the ability to pay her student loans and maintain a minimal standard of living under the first Brunner factor.

### c.  The lump sum disability benefit

Finally, the Court does not believe the Debtor's use of the $14,000 lump sum in social security disability benefits prevents a finding of good faith.  Notably, Sallie Mae and NHHEAF

---

[10]  See NHHEAF's Ex. 202 (showing the Debtor's student loan account history and entries beginning in June 2007 showing a deferment request and confirmation).

[11]  See Doc. No. 42, Joint Pretrial Statement (Statement of Uncontested Facts).

did not explore this issue deeply at trial.  On cross-examination, the Debtor stated that she used the lump sum to repay those who had loaned her money to live while she was unemployed during the last half of 2007 and early 2008.  She also used the money to continue making payments on prepetition debts.  She said she did not use the lump sum to make payments on her student loans because they were in deferment at the time.

The Court cannot find that the Debtor lacked good faith by deciding to repay relatives and friends the money she borrowed from them for living expenses as she frequently needs to rely on them to help her meet basic needs.  Cf. Denittis v. Educ. Credit Mgmt. Corp. (In re Denittis), 362 B.R. 57, 64 (Bankr. D. Mass. 2007) (questioning whether a debtor's choice to use lump sum payments to repay family who loaned her money and not to repay student loans shows a lack of good faith).  Even including the monthly financial assistance she receives from social security disability, the Debtor barely gets by.  At the time she received the lump sum, her student loans were in deferment, and the Debtor knew she was not obligated to make payments at that point.  The Court does not believe the Debtor lacked good faith by making the choice to repay those who helped her survive when she was not required to pay her student loans.  Accordingly, the Court finds that the Debtor met her burden of showing that she made good faith efforts to repay her loans with Sallie Mae and NHHEAF.

### 3.  Permanent or indefinite hardship

Lastly, under Brunner, the Debtor must prove additional circumstances indicating that her state of affairs is likely to persist for a significant portion of the repayment period on her student loans.  This factor is the core issue in this case.  And the only dispute here is whether the

Debtor's mental condition will affect her ability to generate future income during a significant portion of the repayment period on her loans.

Courts describing this factor of the <u>Brunner</u> test have stated that there must be a "hopelessness for the indefinite future as to any possibility of repayment." <u>Keilig v. Massachusetts Higher Educ. Assistance Corp. (In re LaFlamme)</u>, 188 B.R. 867, 870 (Bankr. D.N.H. 1995). Generally, under this factor, courts consider whether a debtor can show "illness, disability, a lack of usable job skills, or the existence of a large number of dependents." <u>Oyler v. Educ. Credit Mgmt. Corp. (In re Oyler)</u>, 397 F.3d 382, 386 (6th Cir. 2005). Most importantly, the additional circumstances must be beyond the debtor's control, not borne of free choice. <u>Id.</u>

In closing arguments, the Debtor argued that her nearly thirty-year history with depression, although not continuously debilitating, impacts her life frequently and seriously enough that she cannot sustain even part-time, low-stress jobs, performing easy tasks. She also indicated that she has worked very few years in her adult life because of her medical condition and that her past history is a good indicator of her prospects for the future. Sallie Mae and NHHEAF countered that the Court should look to more recent events over the past six or seven years, when the Debtor successfully attended school, performed well, graduated with a degree, and worked in well-paying jobs. Sallie Mae and NHHEAF also argued that the Debtor did not submit evidence on the nature of her medical condition and, without such evidence, there is nothing in the record to prove that the Debtor's condition will persist. In support, Sallie Mae and NHHEAF cite <u>Nash v. Connecticut Student Loan Found. (In re Nash)</u>, 446 F.3d 188 (1st Cir. 2006), to suggest that debtors with similar medical conditions seeking to discharge their student loans must provide some objective medical evidence (e.g., an expert, medical reports, doctor

letters) to carry their burden of proving their condition will persist.  Put differently, NHHEAF and Sallie Mae argue that without corroborating evidence on the nature of the debtor's medical condition, there is no way to tell what the future holds.

The precise legal issue raised by the parties does not tread on new ground.  Many courts have considered whether a debtor must put forth corroborating evidence, beyond her own testimony, on the nature of her medical condition and its future impact.  But courts appear to have split on this question.  Compare, e.g., Educ. Credit Mgmt. Corp. v. Mosley (In re Mosley), 494 F.3d 1320, 1325-26 (11th Cir. 2007) (declining to adopt a rule requiring independent medical evidence to corroborate a debtor's credible testimony); Barrett v. Educ. Credit Mgmt. Corp. (In re Barrett), 487 F.3d 353 (6th Cir. 2007) (a debtor can show inability to work from a variety of evidence, including the debtor's own credible testimony about his medical condition) with Burton v. Educ. Credit Mgmt. Corp. (In re Burton), 339 B.R. 856, 881 (Bankr. E.D. Va. 2006) (following the "overwhelming weight of authority" requiring documentary or testimonial corroborating medical evidence to substantiate a debtor's claims) (cited in Nash); Lowe v. ECMC (In re Lowe), 321 B.R. 852, 859 (Bankr. N.D. Ohio 2004) (same); Pobiner v. Educ. Credit Mgmt. Corp. (In re Pobiner), 309 B.R. 405, 419 (Bankr. E.D.N.Y. 2004) (same).  In all undue hardship cases, though, the analysis heavily depends on the record.

Because Sallie Mae and NHHEAF rely on it, the Court begins its analysis with Nash.  Although the First Circuit in Nash never endorsed a particular "undue hardship" test, it decided the same issue raised by the second Brunner factor and the other various "undue hardship" standards:  whether the debtor's medical condition will prevent employment for the foreseeable future.  Nash, 446 F.3d at 190-91.  Notably, Nash resolved a narrow, fact-driven question:

whether the record supported the bankruptcy court's determination that the debtor had not carried her burden of proving a sufficient likely future period of employment "where the illness is bipolar disorder, where we have no prognosis from treating physicians or other experts, [and] where the testimony of [the debtor] herself as to the future is necessarily speculative." Id. at 193.

The debtor in Nash had a nearly fourteen-year, uninterrupted period of success before things turned sour.  She graduated from Dartmouth with honors, worked in several successful positions, received her MBA from Yale, and then worked as an investment banker for a securities firm.  But then she decided to attend law school, and only then did any problems appear.  About three years later, when she withdrew from law school and stopped working, she was diagnosed with bipolar disorder.  Five years after that she filed for bankruptcy and sought to discharge her student loans.  Id. at 191.

The focus for the Nash court was the absence of any reliable evidence of future inability to work.  The record contained hardly any evidence on the debtor's prognosis, employment prospects, or her medication.  Id. at 192.  But most importantly, Nash never created a rule requiring debtors with mental conditions seeking to discharge student loans to offer corroborating medical evidence to prove future inability to work.  The court only found that the bankruptcy court did not err in finding the debtor had not met her burden of proof.  Id. at 194.

The Court declines to extend the rationale approved in Nash to this case for two reasons. First, Nash and many cases requiring corroborating evidence in these situations often had other considerations.  For example, in some cases the additional evidence contradicted or undercut the debtor's self-serving testimony about her future prospects with the medical condition.  See, e.g., Nash, 446 F.3d at 193 (doctor's forms submitted by debtor stating she had bipolar disorder also

18

included notation that the disability was "temporary" and the debtor knew that limitation);

Garrett, 180 B.R. at 361 (although debtor testified that she tested positive for multiple sclerosis,

among other conditions, a doctor's letter submitted by the debtor indicated that multiple sclerosis

had not been established).[12]

In other cases, the time period between the onset of the condition's symptoms or the

debtor's diagnosis and the debtor's decision to file bankruptcy and discharge the student loans or

stop working was relatively short, suggesting a greater need for some independent, corroborating

medical evidence on the debtor's future prospects when the debtor's own history with her

condition was somewhat new.  See, e.g., Nash, 446 F.3d at 191-92 (debtor's bipolar symptoms

began about three years before she stopped working and eight years before she filed for

bankruptcy, but was preceded by a fourteen-year period of "high achievement"); Shilling v.

Sallie Mae Servicing Corp. (In re Shilling), 333 B.R. 716, 719-20 (Bankr. W.D. Pa. 2005)

(debtor's history with bipolar disorder before she filed for bankruptcy was about four years).

Here, unlike Nash, the Debtor's history with her mental condition existed long before she

ever decided to file for bankruptcy and discharge her student loans.  And unlike Nash, the record

contains no evidence that might undercut the Debtor's testimony, and Sallie Mae and NHHEAF

never offered any.  This might be a different case if the Debtor had never experienced any

---

[12]  See also Davis v. Educ. Credit Mgmt. Corp. (In re Davis), 373 B.R. 241, 250 (W.D.N.Y. 2007)
(debtor testified to having depression but also admitted that her depression never caused her to lose a job
or miss an interview or employment opportunity); Lowe, 321 B.R. at 859-60 (doctor's statement
submitted as corroborating evidence to support debtor's condition also noted that the debtor was able to
perform the essential functions of her work position); Daugherty v. First Tennessee Bank (In re
Daugherty), 175 B.R. 953, 959 (Bankr. E.D. Tenn. 1994) (debtor testified that her depression prevented
her from working but she also testified that her doctors encouraged her to work, she continued to actively
pursue new jobs, and she certified for unemployment purposes that she was able and available for full-
time work).

symptoms of depression until she enrolled at Granite State.  The Court might then require corroborating evidence to support her undue hardship claim based on a medical condition.  But the evidence at trial shows that the Debtor has battled with depression for nearly thirty years.  And Sallie Mae and NHHEAF never presented any evidence at all to rebut this.

Second, the Court will not extend <u>Nash</u> because this case has underlying evidentiary problems due to a burden-shifting issue.  Debtors bear the burden of proof to discharge a student loan in bankruptcy.  But "[o]nce the debtor makes a credible showing that undue hardship exists, the burden of production shifts to the creditor to present some evidence to rebut the debtor's case.  If the trier of fact remains in doubt as to a fact after the burden of production shifts to the creditor, then the creditor has failed to satisfy its burden and the trier of fact must find that undue hardship exists."  <u>Perry v. Student Loan Guarantee Found. of Arkansas (In re Perry)</u>, 239 B.R. 801, 808-09 (Bankr. W.D. Ark. 1999).

The burden of proof and the duty of going forward with evidence—the burden of production—are two very different things.  The burden of proof remains on the party affirming a fact in support of his case and does not change during the trial.  But the burden of production may shift from side to side as the case progresses, according to the proof offered in support or denial of the relevant facts.  <u>Braunstein v. Walsh (In re Rowanoak Corp.)</u>, 344 F.3d 126, 131 (1st Cir. 2003) (quoting Wigmore on Evidence).  In other undue hardship cases, courts have similarly held that student loan creditors who offer no evidence to rebut a debtor's testimony in support of her mental condition failed to meet their burden of production.  <u>See</u> <u>Barrett</u>, 487 F.3d at 363 (student loan creditor failed to offer evidence to rebut debtor's credible testimony on his medical history and condition or its impact on his ability to work); <u>Cheney v. Educ. Credit Mgmt. Corp.</u>

20

(In re Cheney), 280 B.R. 648, 662 (N.D. Iowa 2002) (rejecting creditor's argument that debtor's testimony on her mental condition was self-serving because the creditor failed to rebut that testimony and bankruptcy court properly judged the testimony as credible); Cline v. Illinois Student Loan Assistance Ass'n (In re Cline), 248 B.R. 347, 350 (B.A.P. 8th Cir. 2000) (similar).

After observing the Debtor's testimony at trial, her responses to questions, and her demeanor, the Court finds her testimony credible. The Court also finds Cindy Giuffre's testimony credible. The Debtor does not enjoy her mental condition or the position it has put her in. But she made great efforts to find employment and obtain an education when she felt she could. After graduating, she began working more and more, in positions with increasing responsibility. The stress from that period triggered her depressive symptoms and led to her more recent setbacks and unemployment. Although the Debtor never submitted corroborating medical evidence to prove how her depression prevents her future ability to work, Sallie Mae and NHHEAF never challenged the Debtor's long history with depression, her testimony about her symptoms and their impact on her daily life, and her testimony that she took medication and received counseling.[13] By not presenting credible evidence to rebut these allegations, Sallie Mae

---

[13] In summarizing this part of the Brunner test, Judge Yacos once said that "[t]he inability to pay which can constitute undue hardship must be long-term and not simply a temporary loss of income." Barrows v. Illinois Student Assistance Comm'n (In re Barrows), 182 B.R. 640, 648 (Bankr. D.N.H. 1994). If anything, the record here demonstrates that the Debtor's ability to pay, rather than her inability to pay, was short-term. Because of her depression, the Debtor worked for only about seven years over the course a twenty-two-year working history since high school. Even then, the years she did work before college were marked with intermittent jobs that never lasted very long and provided meager income at best. So the Debtor's more recent jobs at Granite State during school and shortly after represent her only real solid working history. But the Debtor testified that the stress from those positions wore her down, and her depression and anxiety eventually came back, causing her to show up late, miss work, and slide back into the same depressive state that has haunted her since childhood.

and NHHEAF did not meet their corresponding burden of production and took the chance that this Court would find against them.  See In re Rowanoak Corp., 344 F.3d at 131-32.

Past results, though not a guarantee of future performance, can still be strong evidence of future performance.  The student loan creditors here failed to present evidence to rebut the Debtor's long history with depression and its past effects on her ability to work and provide income.  And the Court believes that the Debtor's testimony on her depression provides credible evidence that her condition will persist into the future.  Thus, the Court finds that the Debtor has met her burden on this factor of the Brunner test because her depression and anxiety will likely persist for a significant portion of the repayment period, resulting in a continued inability to repay her student loans.

## IV.  CONCLUSION

The Debtor put forth credible evidence and satisfied her burden of demonstrating that the repayment of her student loans would impose an undue hardship within the meaning of 11 U.S.C. § 523(a)(8).  Accordingly, the Debtor's obligations to both NHHEAF and Sallie Mae will not be excepted from discharge.  This opinion constitutes the Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052.  The Court will issue a separate judgment consistent with this opinion.

ENTERED at Manchester, New Hampshire.


Date:   September 3, 2009                    /s/ J. Michael Deasy
                                             J. Michael Deasy
                                             Bankruptcy Judge